Filed 12/5/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CALIFORNIA FAIR PLAN ASSOCIATION, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RICARDO LARA, as Insurance Commissioner, etc., <br><br> Defendant and Respondent. | B336043 <br><br> Los Angeles County Super. Ct. No. 21STCV38060 |

APPEAL from a judgment of the Superior Court, Los Angeles County, Curtis A. Kin, Judge.  Reversed with directions.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez; Hinshaw & Culbertson and Spencer Y. Kook for Plaintiff and Appellant.

Michelman & Robinson, Elizabeth Tosaris and Reuben A. Ginsburg for Pacific Association of Domestic Insurance Companies as Amicus Curiae on behalf of Plaintiff and Appellant.

Rob Bonta, Attorney General, Tamar Pachter, Assistant Attorney General, Lisa W. Chao and John C. Keith, Deputy Attorneys General, for Defendant and Respondent.

Ken Lau, Chief Counsel for the Department of Industrial Relations, Steven A. McGinty, Assistant Chief Counsel and Thomas G. Routson, Staff Counsel, for Katrina S. Hagen, Director of Industrial Relations, as Amicus Curiae on behalf of Defendant and Respondent.

---

In 1968, our Legislature enacted the "Basic Property Insurance Inspection and Placement Plan" (the Basic Property Insurance Law, Ins. Code, §§ 10090–10100.2).[1]  To meet its defined goals, the law established a joint reinsurance association known as the California FAIR Plan Association (CFPA).[2] (§ 10090, subd. (d).)  CFPA is the insurer of last resort in this state, statutorily mandated to offer basic property insurance to any "persons having an interest in real or tangible personal

---

[1]  Statutory references are to the Insurance Code, unless otherwise designated.

[2]  FAIR is an acronym that refers to "fair access to insurance requirements."  (§ 10090, subd. (d).)  As we will discuss, the Basic Property Insurance Law's purposes are (1) to assure stability in the property insurance market, (2) to assure the availability of basic property insurance as defined in the law, (3) to encourage the maximum use of the normal insurance market in obtaining basic property insurance, and (4) to provide for the equitable distribution among admitted insurers of the responsibility for insuring qualified property for which basic property insurance cannot be obtained through the normal insurance market. (§ 10090.)

property who, after diligent effort . . . , are unable to procure such insurance through normal channels from an admitted insurer." (§ 10094, subd. (a); *St. Cyr v. California FAIR Plan Assn.* (2014) 223 Cal.App.4th 786, 793 (*St. Cyr*).)

This appeal concerns the statutory definition of "basic property insurance."  The law defines the term as follows:

> " 'Basic property insurance' means insurance against direct loss to real or tangible personal property at a fixed location in those geographic or urban areas, as designated by the [Insurance Commissioner of this state], from perils insured under the standard fire policy and extended coverage endorsement, from vandalism and malicious mischief, *and includes other insurance coverages as may be added with respect to that property* by the industry placement facility with the approval of the commissioner or by the commissioner, but shall not include insurance on automobile risks, commercial agricultural commodities or livestock, or equipment used to cultivate or transport agricultural commodities or livestock."  (§ 10091, subd. (c)(1), italics added.)[3]

---

[3]    As we will discuss, section 10091, subdivision (c)(2) refines this definition to specify that, "[f]or the purposes of earthquake coverage that is provided as a component of basic property insurance, the association shall sell only the policy described in Section 10089."

We must decide whether the phrase "and includes other insurance coverages as may be added with respect to that property" authorizes the Insurance Commissioner (the Commissioner) to add liability insurance to the coverages CFPA must offer as "basic property insurance."

Plaintiff and appellant CFPA petitioned the trial court for a writ of mandate directing the Commissioner to withdraw, annul, or vacate a 2021 order directing CFPA to submit a plan to offer and sell a " 'Homeowners' Policy' " that provides coverage for, among other things, "premises liability" and "incidental workers' compensation" (Order No. 2021-2). The trial court found the "other insurance coverages" phrase ambiguous and, in deference to the interpretation advanced by the Department of Insurance (DOI), construed the statute to authorize the addition of liability insurance coverages, so long as those coverages "have some connection to the property." We reach a different conclusion. While we agree the statutory definition is susceptible of DOI's interpretation, our review of the statutory scheme and the historical context of the law's passage compel us to conclude that the Legislature's intent in enacting the Basic Property Insurance Law was to ensure that first-party *property* insurance —not liability coverage—would be available to property owners in this state. We therefore reverse the judgment and direct the trial court to grant the petition for writ of mandate.

## BACKGROUND

On September 24, 2021, the Commissioner issued Order No. 2021-2, which directs CFPA to submit "an amendment to its current Plan of Operation to provide that in addition to the Basic Property Insurance" the association currently offers, CFPA "shall also offer and sell a 'Homeowners' Policy,' that insures against,

4

at a minimum, the following perils to the insured property not currently covered under [CFPA's] dwelling fire policy: accidental discharge or overflow of water or steam; *premises liability*; *incidental workers' compensation*; theft; falling objects; weight of ice, snow, or sleet; freezing; and loss of use, including coverage for additional living expenses and fair rental value."[4] (Italics added.)

CFPA filed a verified petition for writ of mandate challenging Order No. 2021-2. The petition alleges the order violates the Basic Property Insurance Law because "liability coverages, such as personal liability, medical payments coverage or incidental worker's compensation" are not " 'basic property insurance' " as defined in the law. In support of the petition, CFPA argued the Commissioner's authority to order additional insurance coverages is limited to first-party property insurance— i.e., " 'insurance against direct loss to real or tangible personal property.' "[5] (See § 10091, subd. (c)(1).)

---

[4] As we will discuss, the Basic Property Insurance Law directs CFPA to administer a plan of operation, "consistent with" the provisions of the law, to assist persons in securing basic property insurance and to apportion that insurance equitably among CFPA's members. (§§ 10091, subd. (a), 10095.) The Commissioner has authority to approve, withdraw, or revoke approval "if the commissioner feels it is necessary to carry out the purposes of the [Basic Property Insurance Law]." (§ 10095, subd. (f).) If CFPA fails to submit a revised plan that is acceptable, the Commissioner is charged with "promulgat[ing] a plan of operation or part of a plan as the commissioner may deem necessary to carry out [the law]." (*Ibid.*)

[5] CFPA also challenged the sufficiency of the Commissioner's findings and evidence to support Order No. 2021-2. Because we

5

The Commissioner opposed the petition, arguing the Basic Property Insurance Law authorized him to add coverages for indirect losses and liability insurance as long as the added coverages were " 'with respect to [the insured] property.' " (See § 10091, subd. (c)(1).) He maintained his interpretation of the law was entitled to " 'great weight,' " as DOI and CFPA had, since the early-1990s, agreed the association could offer liability coverage to businessowners under the statutory language defining " ' "basic property insurance" ' " to include " ' "other insurance coverages as may be added with respect to [that] property." ' "

The trial court denied CFPA's petition. As we will discuss, the court determined the statutory text was ambiguous and thus focused its analysis on "the amount of deference, if any, the Court should give to the Commissioner's interpretation" to resolve the ambiguity. Although the court acknowledged DOI "has not had a consistent interpretation of the [Basic Property Insurance Law] since [the law's] original adoption," it nonetheless concluded the Commissioner's current interpretation was "entitled to substantial deference" as it was "generally consistent with the Commissioner's prior approval of liability coverage" in the businessowners policy dating back to the early-1990s.

The trial court entered judgment for the Commissioner denying CFPA's petition. This timely appeal followed.

---

conclude the Commissioner lacked authority to order liability coverage under the Basic Property Insurance Law, we do not address these contentions or CFPA's related challenge to the trial court's order denying the association's motion to compel certain discovery.

## DISCUSSION

### 1. *Standard of Review and Law Governing Statutory Interpretation*

A public agency's quasi-legislative acts are subject to judicial review by a petition for a writ of ordinary mandate. (Code Civ. Proc., § 1085; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566–567; *California Manufacturers & Technology Assn. v. Office of Environmental Health Hazard Assessment* (2023) 89 Cal.App.5th 756, 769 (*California Manufacturers*).)  Generally, " '[a]s to quasi-legislative acts of administrative agencies, "judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices required by law." ' [Citations.] When, however, a [quasi-legislative act] is challenged as inconsistent with the terms or intent of the authorizing statute, the standard of review is different, because the courts are the ultimate arbiters of the construction of a statute." (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11, fn. omitted.)

This appeal concerns the parties' competing interpretations of the Basic Property Insurance Law—specifically, the statutory definition of "basic property insurance" set forth in section 10091, subdivision (c)(1).  Because this issue is fundamentally one of statutory interpretation, we review the trial court's denial of the petition de novo. (*California Assn. of Psychology Providers v. Rank, supra,* 51 Cal.3d at pp. 11–12; *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 271–272; *California Manufacturers, supra,* 89 Cal.App.5th at p. 769; see also *McGill*

7

*v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786 [in mandamus actions, the reviewing court exercises its independent judgment, performing the same function as the trial court].)

"The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] To determine legislative intent, we turn first to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340 (*Nolan*).)

Although we independently determine the meaning of a statute, if an agency charged with administering the legislation issues its own interpretation, courts will give the administrative construction appropriate weight and respect. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha*).) As we will discuss, the judicial deference accorded to an agency's interpretation is "fundamentally situational" and depends upon " 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " (*Id.* at pp. 12, 14–15, italics omitted.)

## 2. *The Statutory Definition of "Basic Property Insurance" Is Ambiguous*

The Basic Property Insurance Law created CFPA as a joint reinsurance association of all insurers authorized to write and engaged in writing "basic property insurance or any component of basic property insurance in multiperil policies" in California. (§ 10094, subd. (a); see § 10090, subd. (d).) The association serves as the state's "insurer of last resort," statutorily charged with making "basic property insurance" available to any " 'persons having an interest in real or tangible personal property who, after diligent effort . . . , are unable to procure such insurance through normal channels from an admitted insurer.' " (*St. Cyr, supra,* 223 Cal.App.4th at p. 793, quoting § 10094.) The law directs CFPA to administer a plan of operation to assist persons in securing basic property insurance and to apportion that insurance equitably among CFPA's members. (§§ 10091, subd. (a), 10095.) The Commissioner has authority to approve, withdraw, or revoke approval "if the commissioner feels it is necessary to carry out the purposes of the [Basic Property Insurance Law]." (§ 10095, subd. (f).) If CFPA fails to submit a revised plan that is acceptable, the Commissioner is charged with "promulgat[ing] a plan of operation or part of a plan as the commissioner may deem necessary to carry out [the law]." (*Ibid.*)

The statutory definition of "basic property insurance" establishes the insurance coverages that CFPA must offer under the Basic Property Insurance Law. Section 10091, subdivision (c) provides:

> " 'Basic property insurance' means insurance against direct loss to real or tangible personal property at a fixed location in those geographic

or urban areas, as designated by the commissioner, from perils insured under the standard fire policy and extended coverage endorsement, from vandalism and malicious mischief, *and includes other insurance coverages as may be added with respect to that property* by the industry placement facility with the approval of the commissioner or by the commissioner, but shall not include insurance on automobile risks, commercial agricultural commodities or livestock, or equipment used to cultivate or transport agricultural commodities or livestock. [¶] For the purposes of earthquake coverage that is provided as a component of basic property insurance, the association shall sell only the policy described in Section 10089." (§ 10091, subd. (c)(1), (2), italics added.)

The parties agree the validity of Order No. 2021-2 depends on the meaning of the italicized phrase and the extent to which it authorizes the Commissioner to expand the coverages CFPA must offer as "basic property insurance." Unsurprisingly, they advance competing constructions of the statute.

CFPA emphasizes that the Legislature expressly defined "basic property insurance" to mean "insurance against *direct loss* to real or tangible personal *property*." (§ 10091, subd. (c)(1), italics added.) This definition, the association says, employs quintessentially first-party property insurance language that is qualitatively distinct from the sort of third-party liability coverage that Order No. 2021-2 directs CFPA to offer. " 'Property insurance,' " our Supreme Court has explained, is a

10

contract " 'in which the insurer agrees to indemnify the insured in the event that *the insured property suffers a covered loss.*' " (*Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 406 (*Garvey*), italics added.) " 'Coverage, in turn, is commonly provided by reference to causation, e.g., "loss caused by . . ." certain enumerated perils.' " (*Ibid.*) In contrast, "the right to coverage in the third[-]party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty." (*Id.* at p. 407.) Thus, while first-party property insurance covers losses *directly suffered by the insured's property*, third-party liability insurance provides coverage for losses *suffered by other persons* for which the insured may be legally responsible. (Croskey et al., Cal. Prac. Guide: Insurance Litigation (The Rutter Group 2025) ¶ 6:1; *Garvey,* at p. 407.) In view of these fundamental differences, CFPA argues the Legislature could not have intended the phrase "other insurance coverages as may be added with respect to that property" to include third-party liability coverages when it expressly defined "basic property insurance" to mean "insurance against direct loss to real or tangible personal property." (§ 10091, subd. (c)(1).)

The Commissioner, on behalf of DOI, advances a different interpretation of these phrases, which he urges should be understood as serving different purposes with respect to defining the coverages CFPA must offer as "basic property insurance." In the Commissioner's telling, the first part of the statutory definition—beginning with "insurance against direct loss to real or tangible personal property" and including the list of covered "perils" (§ 10091, subd. (c)(1))—should be understood as a " 'Floor Provision' describing the coverage [CFPA] must offer to qualifying property owners who want it." The second part

11

of the definition—beginning with the phrase "and includes other insurance coverages as may be added with respect to that property" (§ 10091, subd. (c)(1))—he says serves as a " 'Catchall Provision' describing those coverages *above the statutory floor* that the Commissioner may, in his discretion, order or approve that [CFPA] offer."[6] (Italics added.) The Commissioner argues the statutory text signals this difference in purpose by employing the term "perils" and enumerating the list of perils that must be covered in the Floor Provision, while trading this first-party property insurance terminology for the broader word "coverages" in the Catchall Provision. Thus, the Commissioner says, " 'it must be presumed that the Legislature intended a different meaning' for 'insurance coverages' in the Catchall Provision than merely the insurance against direct property loss from perils that is the subject of the Floor Provision."

The trial court determined section 10091, subdivision (c) was ambiguous. While the court acknowledged the statutory definition could be read—as CFPA argued—"to limit 'other insurance coverages' to coverages only for loss 'with respect to' *the property itself*," it also found the second part of the definition could be construed—as the Commissioner urged—to be a "catchall provision that allows the Commissioner to determine, in his broad discretion, whether [CFPA] should provide 'other

---

[6] The Commissioner also identifies a third part—the "Excluded Coverages" provision—that specifies the coverages that cannot be considered "basic property insurance" as defined in the law. (See § 10091, subd. (c) [" 'Basic property insurance' . . . shall not include insurance on automobile risks, commercial agricultural commodities or livestock, or equipment used to cultivate or transport agricultural commodities or livestock."].)

insurance coverages' that have *some connection to the property*." (Italics added.) With respect to the Commissioner's proffered construction, the court found it compelling that the statutory definition "contain[ed] a limitation on 'perils,' " but the Legislature had "used a different word, 'coverages,' when stating what the Commissioner may order [CFPA] to provide as basic property insurance."

We agree with the trial court that the phrase "other insurance *coverages*" introduces an ambiguity into the definition of basic property insurance that makes it at least susceptible of the Commissioner's proffered interpretation. As we have discussed, an important distinction between property insurance and liability insurance is the different analytical frameworks used to determine coverage. While property insurance indemnifies against direct physical loss caused by enumerated perils, liability insurance indemnifies against "a broader spectrum of risks" including third-party claims arising from the insured's conduct. (*Garvey, supra,* 48 Cal.3d at p. 407.) Had the Legislature intended to confine the Commissioner's authority to additional perils within the traditional property insurance framework, the clearest way to do this would have been to use the word "perils" in describing what other coverages may be added with respect to the covered property. The Legislature's choice of broader language suggests a possible intent to afford flexibility in expanding the coverages CFPA must offer to carry out the purposes of the Basic Property Insurance Law.

On the other hand, section 10091, subdivision (c)(1) expressly defines "basic property insurance" as "insurance against direct loss to real or tangible personal property," and it is

13

at least reasonable to construe the Legislature's use of the phrase "other insurance coverages" in light of this definitional anchor. Indeed, as the trial court recognized, the critical phrase refers to "other insurance coverages as may be added *with respect to that property*," and the Legislature may well have intended this language to require a direct nexus between the additional coverage and a loss suffered by *the insured property itself*. Moreover, while a phrase like "other covered perils" may have been more precise, "other insurance coverages" can nonetheless be reasonably read to refer to additional perils or risk types within the first-party property insurance framework. In fact, an example of this usage appears in section 10091, subdivision (c)(2), which refers to "earthquake *coverage* that is provided as a component of basic property insurance." (Italics added.) Earthquake coverage, by its nature, indemnifies the insured for direct physical loss caused by a fortuitous event—precisely the type of peril contemplated in traditional property insurance. (See *Garvey, supra,* 48 Cal.3d at p. 406 [" 'The term "perils" in traditional property insurance parlance refers to fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss.' "].)

In sum, the statutory definition of "basic property insurance" is reasonably susceptible of both DOI's and CFPA's proffered interpretations. Accordingly, we must refer to extrinsic aids to ascertain the controlling legislative intent. (*Nolan, supra,* 33 Cal.4th at p. 340.)

**3.** ***The History and Purposes of the Basic Property Insurance Law Compel a Construction that Confines the Coverage CFPA Must Offer to First-Party Property Insurance***

As with all legislation, "[w]e construe insurance statutes 'to ascertain and effectuate legislative intent.' " (*California FAIR Plan Assn. v. Garnes* (2017) 11 Cal.App.5th 1276, 1287, quoting *CalFarm Ins. Co. v. Wolf* (2001) 86 Cal.App.4th 811, 815; accord *Nolan, supra,* 33 Cal.4th at p. 340.) To the extent statutory language is reasonably susceptible of more than one interpretation, "consideration should be given to the consequences that will flow from a particular interpretation" as well as "the legislative history of the statute and the wider historical circumstances of its enactment." (*Dyna-Med, Inc. v. Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1387 (*Dyna-Med*).) "The statutory meaning of a word or phrase must be gathered from the purpose for which the law containing it was enacted." (*Mendoza v. Central Forest Co*. (1918) 37 Cal.App. 289, 295.) "One ferrets out the legislative purpose of a statute by considering its objective, the evils which it is designed to prevent, the character and context of the legislation in which the particular words appear, the public policy enunciated or vindicated, the social history which attends it, and the effect of the particular language on the entire statutory scheme." (*Santa Barbara County Taxpayers Assn. v. County of Santa Barbara* (1987) 194 Cal.App.3d 674, 680.) Here, drawing on these extrinsic aids and reading the statutory definition of "basic property insurance" in context with the larger statutory scheme, we are compelled to conclude the Legislature intended

15

to mandate the availability of only basic first-party *property insurance* when it enacted the Basic Property Insurance Law.

Because the Legislature's intent must be understood as of the time of the law's enactment, we start with the relevant historical context, as it informs the objects the legislation was meant to achieve and the evils it was intended to remedy. (See *Dyna-Med, supra,* 43 Cal.3d at p. 1387; *Nolan, supra,* 33 Cal.4th at p. 340.) Our Legislature enacted the Basic Property Insurance Law in 1968 as a direct legislative response to mounting instability in our state's *property insurance market*, particularly in urban and high-risk areas. In the wake of devastating brush fires in Southern California and the Watts riots of the mid-1960s, insurers began withdrawing coverage from neighborhoods deemed uninsurable, leaving thousands of property owners without access to basic fire insurance. As explained in a 1972 report by DOI to the California Legislature regarding the "Availability, Adequacy, and the Cost of Property Insurance in High Risk Areas," the "genesis" of the Basic Property Insurance Law was "the collapse of will of the insurance industry to afford *property insurance protection* to risks in inner city areas that were perceived to be subject to urban riots and, peculiar to California, to risks located in hazardous brush fire areas." (Italics added.)

Recognizing the urgent need for market intervention as similar urban riots swept the country, the United States Congress passed the Urban Property Protection and Reinsurance Act of 1968 (UPPRA), which encouraged states to establish residual market mechanisms to ensure insurance availability in underserved communities—so-called "Fair Access to Insurance

16

Requirements" or "FAIR" plans.[7] The DOI report notes that the Congress and our state Legislature had found " '[t]he vitality of many American cities was being threatened by the deterioration of their inner city areas; responsible owners . . . in many of these areas were unable to obtain adequate *property insurance coverage* against fire, crime and other perils; the lack of such insurance coverage [was] accelerat[ing] the deterioration of these areas by discouraging private investment and restricting the availability of credit to repair and improve property therein; and this deterioration pose[d] a serious threat to the national economy and to the economy of (California).' " (Italics added.) To remedy this situation, the UPPRA made reinsurance available to private insurance companies for losses resulting from riots and civil disorders on the condition that states establish a plan to "assure the availability of basic property insurance." As the DOI report explains, the Basic Property Insurance Law established CFPA "to fulfill the Federal criteria and to meet the needs of persons

---

[7] See *U.S. Fire Ins. Co. v. U.S. Dept. of Housing* (D.D.C. 1979) 478 F.Supp. 135, 136 ["The Urban Property Protection and Reinsurance Act was enacted by the Congress in 1968 after a rash of civil disorders led it to conclude that the lack of adequate reinsurance coverage in inner city areas was contributing to their deterioration since heavy losses sustained by private insurance companies as a result of the disorders jeopardized their ability to provide property protection insurance for them. Under this statute, the Federal Insurance Administration, an agency of the Department of Housing and Urban Development, is authorized to provide riot reinsurance to private insurers subject to certain terms and conditions, one of which is that the particular state in which the company operates establish a federally-approved plan to provide Fair Access to Insurance Requirements (FAIR)."].

17

unable to obtain *property insurance* in hazardous brush fire areas." (Italics added; accord *St. Cyr, supra,* 223 Cal.App.4th at p. 789.)

Consistent with this historical context, the statutorily defined purposes of the law are singularly focused on *property insurance* coverage. Those purposes are enumerated in section 10090, which provides:

> "The purposes of this chapter are to do all of the following: [¶] (a) To assure stability in the property insurance market for property located in the State of California. [¶] (b) To assure the availability of basic property insurance as defined by this chapter. [¶] (c) To encourage maximum use, in obtaining basic property insurance, of the normal insurance market provided by admitted insurers and licensed surplus line brokers. [¶] (d) To provide for the equitable distribution among admitted insurers of the responsibility for insuring qualified property for which basic property insurance cannot be obtained through the normal insurance market by the establishment of a FAIR Plan (fair access to insurance requirements), an industry placement facility and a joint reinsurance association."

As with the law's historical context, the Legislature's express statement of purposes in section 10090 provides a critical interpretive lens through which the definition of "basic property insurance" in section 10091, subdivision (c) must be construed. The first stated purpose—to "assure stability in the *property*

18

*insurance market for property* located in the State of California"
(§ 10090, subd. (a), italics added)—is unambiguously tied to the
availability of first-party coverage for *physical loss or damage to
property*. As we have discussed, liability insurance, by contrast,
does not insure property itself but rather protects against claims
arising from the insured's conduct. (See *Garvey, supra,* 48 Cal.3d
at p. 407.) Thus, DOI's proffered construction is decidedly at
odds with this stated goal, as it would expand CFPA's obligations
far beyond its apparently intended role as a residual market
mechanism for insuring *property* risks. (See *Dyna-Med, supra,*
43 Cal.3d at p. 1387 [considering the "declared" legislative
"purpose of the FEHA," and instructing that statutory language
must be construed "in the context of the [broader] legislative
purpose"].)

DOI's proffered construction is similarly at odds with
the law's third stated purpose—to "encourage maximum use,
in obtaining basic property insurance, of the normal insurance
market provided by admitted insurers and licensed surplus line
brokers." (§ 10090, subd (c).) As its plain language and historical
context indicate, this provision reflects the Legislature's intent
that CFPA serve as a backstop—not a substitute—for the
voluntary market. Unlike the basic property insurance policies
that CFPA currently offers, liability insurance is not subject to
the same access constraints arising from *property damage risks*
that prompted the Basic Property Insurance Law's enactment.
On the contrary, as CFPA emphasizes, the evidence is
undisputed that liability insurance through Difference in
Condition (DIC) policies is widely available in the normal market
for those who may purchase existing basic property insurance

19

policies through CFPA.[8]  Including liability coverage within the definition of "basic property insurance" would thus disincentivize use of the normal market and distort CFPA's function as a

<hr>

[8]   DIC policies are a type of "wrap around" insurance.  These policies are designed to offer current CFPA policyholders the additional liability, medical payment, and worker's compensation coverage that the Commissioner seeks to add to CFPA's offerings with Order No. 2021-2.  The record shows DIC policies are readily available to customers everywhere in the state because the carriers offering this coverage "do not consider the location of the property in determining whether to issue a DIC policy from an underwriting standpoint."

Our Legislature has expressly endorsed the use of DIC policies as a means to fill the gaps in CFPA's current basic property insurance policy.  Under section 678, subdivision (e), every notice of nonrenewal for a residential property insurance policy expiring on or after July 1, 2021 must include the following explanation:  "To supplement a FAIR Plan policy, a Difference in Conditions (DIC) policy should be considered.  A DIC policy is sold by some private insurers, and provides coverage for things not covered by the basic property insurance policy provided by the FAIR Plan.  A consumer who wants broader coverage than that provided by the FAIR Plan policy should contact an agent, broker, or insurance company that offers a DIC policy to obtain this additional coverage."

In connection with arguments regarding the current state of the FAIR Plan, amicus curiae Pacific Association of Domestic Insurance Companies requests that we take judicial notice of a July 2024 press release issued by the Commissioner regarding his purported concerns about the plan's growth.  We deny the request.  (See *Unlimited Adjusting Group, Inc. v. Wells Fargo Bank, N.A.* (2009) 174 Cal.App.4th 883, 888, fn. 4 [declining to take judicial notice of Department of Corporations' press release that had no relevance to issues on appeal].)

backstop for property owners who are unable to purchase coverage from admitted insurers and licensed surplus line brokers.[9] (See *Dyna-Med, supra,* 43 Cal.3d at p. 1387 ["statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible"]; *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [" 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness" ' "].)

The last stated purpose—to "provide for the equitable distribution among admitted insurers of the responsibility for *insuring qualified property* for which basic property insurance cannot be obtained through the normal insurance market" (§ 10090, subd (d), italics added)—again ties the Basic Property Insurance Law's goals to risks arising from *direct loss to property*. Section 10094 operationalizes this purpose by requiring participation in CFPA from insurers "licensed to write and

---

[9] Notably, when DOI issued its report to the Legislature in 1972, the agency had the same understanding about the conflict between the law's stated purpose to encourage maximum use of the normal insurance market and then-current calls to expand the coverages offered by CFPA beyond basic first-party property insurance. After discussing "wrap around" liability policies that were "available from many major carriers" and that offered "the rough equivalent of homeowners coverage" when coupled with a CFPA policy, the report explained: "To the extent that [CFPA] is able to offer identical coverages to those available in the normal market at a generally comparable cost, the avowed purpose to encourage the use of the normal market *will be defeated*." (Italics added.)

21

engaged in writing . . . basic property insurance or any component of basic property insurance in multiperil policies." (§ 10094, subd. (a).) This targeted participation mandate strongly suggests the Legislature intended CFPA to be supported by insurers with exposure in first-party property risks—not liability carriers. To construe "basic property insurance" to include liability coverage—as DOI advocates—would distort the statutory apportionment mechanism, compelling participation from insurers who do not write property insurance and thereby undermining the equitable distribution principle. And, again, DOI's interpretation would sever CFPA from its historical moorings as an association of property insurers created to stabilize access to fire and property insurance in underserved areas—not to replicate the broader liability protections that are readily available in the voluntary market.

All told, while the plain text of section 10091, subdivision (c) is reasonably susceptible of DOI's proffered construction, the historical context of the Basic Property Insurance Law's enactment, its stated purposes, and the larger statutory scheme simply do not support the department's implicit claim that the Legislature intended the law to include a "catchall" mechanism that authorizes the Commissioner to require CFPA to offer liability insurance coverage—even if such coverage were somehow "with respect to [the covered] property" (§ 10091, subd. (c)(1)). Nothing that we can glean from these extrinsic aids suggests the Legislature was focused on—let alone intended to address—gaps in liability coverage when it enacted the law. On the contrary, everything we have reviewed—including DOI's own report to the Legislature just four years after the law's enactment—suggests that the evil the law sought to remedy was

"the collapse of will of the insurance industry to afford *property insurance protection* to risks in inner city areas that were perceived to be subject to urban riots and, peculiar to California, to risks located in hazardous brush fire areas."  (Italics added.) The law's stated purposes align with this remedial goal and, when read in connection with the other extrinsic aids we have discussed, convince us that in authorizing the addition of "other insurance coverages . . . with respect to that property," the Legislature intended these additional coverages to be coterminous in scope with the core definition of "basic property insurance"—namely, "insurance against direct loss to real or tangible personal property at a fixed location."  (§ 10091, subd. (c)(1).)

Although we believe this analysis settles the issue, we will nonetheless address the matter of the deference that should or should not be owed to DOI's construction, as the interpretation of an administrative agency charged with a law's enforcement can, *in appropriate circumstances*, serve as another compelling extrinsic aid in discerning the intended meaning of ambiguous statutory text.  (See *Dyna-Med, supra,* 43 Cal.3d at p. 1388.)

4.    *Deference To DOI's Current Interpretation Is*
      *Not Warranted*

As best we can tell from its written ruling, the trial court did not consider any of the extrinsic aids we have just discussed in construing the ambiguous text of section 10091, subdivision (c).  Instead, the court appears to have rested its construction solely upon the deference it believed was owed to DOI's current understanding of the Commissioner's authority under the law. The Commissioner takes largely the same tack on appeal, arguing we should defer to the interpretation advanced by DOI

23

as the public agency charged with administering the Basic Property Insurance Law.  We are not convinced and conclude the trial court erred when it deferred to DOI without considering the more compelling extrinsic aids we discussed above.  (See *Dyna-Med, supra,* 43 Cal.3d at pp. 1387–1393; *Yamaha, supra,* 19 Cal.4th at pp. 7–8 ["Where the meaning and legal effect of a statute is the issue, an agency's interpretation is *one among several tools* available to the court.  Depending on the context, it may be helpful, enlightening, even convincing.  *It may sometimes be of little worth*."  (Italics added.)].)

In *Yamaha*, our Supreme Court clarified the standard courts must apply when considering what deference should be afforded to an agency's interpretation of a statute.  (*Yamaha, supra,* 19 Cal.4th at p. 6.)  Unlike "quasi-legislative rules" that represent "an authentic form of substantive lawmaking," the court explained an administrative act "*interpreting* a statute . . . does not implicate the exercise of a delegated lawmaking power," but instead "represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts."  (*Id.* at pp. 10–11.)  Nevertheless, "because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues," and it "is this 'expertise,' expressed as an interpretation . . . that is the source of the presumptive value of the agency's views."  (*Id.* at p. 11.)  However, because "an interpretation is an agency's *legal opinion*, however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference."  (*Ibid.*)

24

In view of these principles, the *Yamaha* court held the question of whether "judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is thus fundamentally *situational*." (*Yamaha, supra,* 19 Cal.4th at p. 12.) Courts therefore must consider a constellation of factors relevant to the legal issue, the agency's expertise, and the reliability of the interpretation in determining what deference should be afforded to the agency's interpretation. (*Ibid.*) These factors, the *Yamaha* court explained, fall into two broad categories: (1) those suggesting the agency has " 'a comparative interpretive advantage over the courts,' " and (2) those suggesting the agency's interpretation " 'is probably correct.' " (*Ibid.*)

The first category—concerning the agency's comparative advantage over the courts—includes considerations such as the technical complexity of the statute, the agency's familiarity with its own regulations, and the practical implications of competing interpretations. (*Yamaha, supra,* 19 Cal.4th at p. 12.) These factors " 'assume the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Ibid.*) With respect to this category, deference is more likely to be warranted " 'to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Ibid.*)

The second category—concerning the likelihood that the agency's interpretation is correct—requires the court to assess

whether the interpretation was carefully considered by senior officials, whether it has been " 'consistently maintained' " over time, and whether it was "contemporaneous with legislative enactment of the statute being interpreted." (*Yamaha, supra,* 19 Cal.4th at pp. 12–13.) " '[A]n interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of deference,' " while " '[a] vacillating position . . . is entitled to no deference' " at all. (*Id.* at p. 13.) In short, the "deference due an agency interpretation . . . turns on a legally informed, commonsense assessment of their contextual merit." (*Id.* at p. 14.) " 'The weight of such a judgment in a particular case,' . . . 'will depend upon *the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' "* (*Id.* at pp. 14–15.)

It does not appear from the written ruling that the trial court considered the first category of factors to assess whether DOI has a comparative interpretive advantage over the courts in construing the meaning of "basic property insurance" as defined in section 10091, subdivision (c). The Commissioner argues this comparative advantage exists to the extent the phrase "other insurance coverages as may be added" (§ 10091, subd. (c)(1)) is "open-ended," and because section 10090 sets forth purposes that are " 'entwined with issues of fact, policy, and discretion.' " We are not convinced.

As CFPA correctly points out, the sort of "open-ended" statutes the *Yamaha* court had in mind are those that delegate to an administrative agency broad authority to interpret or elaborate on a statute—not merely those with open-ended

26

language that serves as the source of ambiguity requiring judicial construction. (See, e.g., *American Coatings Assn. v. South Coast Air Quality Management Dist*. (2012) 54 Cal.4th 446, 453, 469 [statutory text was " ' "open-ended, [and] entwined with issues of fact, policy, and discretion" ' " to the extent it required agency to adopt regulations that " 'reflect the best available technological and administrative practices' "]; *California Manufacturers*, *supra*, 89 Cal.App.5th at pp. 769–770, 773–774 [statute required agency to establish an " 'adequate margin of safety' " and was thus open-ended, affording latitude to ensure public health].) More generally speaking, the Commissioner's argument simply begs the question. To deem the definition of "basic property insurance" open-ended and freighted with discretionary policy judgments as he contends, we would first have to accept the Commissioner's proffered interpretation of the disputed statutory language—i.e., that it gives him broad discretion to require CFPA to offer any form of insurance with respect to property so long as the Commissioner judges it necessary to carry out the law's purposes. An argument that rests on the validity of the conclusion it seeks to establish is not a convincing argument.[10]

---

[10] We also agree with CFPA that there is no reason to assume DOI has special expertise or technical knowledge relevant to ascertaining the meaning of the disputed text or the legislative intent behind it. As we have noted, these factors are more likely to warrant deference " 'to an agency's interpretation *of its own regulation than to its interpretation of a statute*, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Yamaha, supra,* 19 Cal.4th at p. 12, italics added.) The mere fact that the Basic Property Insurance Law appears in the Insurance Code does not make courts any less

(See, e.g., *Rodgers v. Workers' Comp. Appeals Bd.* (1984) 36 Cal.3d 330, 341 (*Rodgers*) [rejecting statutory construction that "simply assumes its conclusion"].)

The trial court's analysis focused exclusively on the second category of *Yamaha* factors concerning the likelihood that the agency's interpretation is correct—specifically, the matter of whether the agency's proffered interpretation has been long-standing and consistently maintained. (*Yamaha, supra,* 19 Cal.4th at pp. 12–13.) In assessing this factor in favor of deference, the court was persuaded by the fact that, since 1994, CFPA has offered a Businessowners Policy (BOP)—with the Commissioner's approval—that provides "business liability" coverage to businessowners unable to obtain this coverage in the normal market. CFPA argues the court misapplied this factor. Citing DOI's 1972 report to the Legislature regarding the "Availability, Adequacy, and the Cost of Property Insurance in High Risk Areas," the association argues the department's proffered interpretation was neither contemporaneous with the

competent to interpret the meaning of "basic property insurance" than DOI. (See, e.g., *Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 74–79 [examining Basic Property Insurance Law's statutory scheme and construing statute consistent with DOI's "long-standing administrative construction"]; *St. Cyr, supra,* 223 Cal.App.4th at pp. 792–800 [examining the definition of "basic property insurance," purposes of the law, and several other Insurance Code provisions in determining CFPA fulfilled "its contractual and statutory obligations" to claimant]; see also *Wexler v. California FAIR Plan Assn.* (2021) 63 Cal.App.5th 55, 68 ["FAIR Plan's slender coverage makes sense. By design, FAIR Plan is an insurer of last resort. FAIR Plan's policy is basic to make insurance available and affordable to homeowners in high risk areas."].)

Basic Property Insurance Law's enactment, nor consistently maintained, and thus should not have commanded the deference the trial court gave to it.  We agree with CFPA—the department's later adoption of an interpretation that it had rejected only four years after the law's enactment does not give us compelling reason to assume DOI's current interpretation is likely correct. (See *ibid.*)

As discussed, in 1972, DOI published a report to our state Legislature identifying the "genesis" of the Basic Property Insurance Law as "the collapse of will of the insurance industry to afford property insurance protection to risks in inner city areas that were perceived to be subject to urban riots and, peculiar to California, to risks located in hazardous brush fire areas." Part of this report addressed criticisms CFPA had faced for "not making many of the coverages that could be purchased in the normal market available to its insureds," including "the lack of the homeowners type package policy for personal [liability] risks."  The DOI report explained the "justification for the lack of broader coverage is embodied in the *narrow scope of legislative intent at the time the FAIR Plan was created.*"  (Italics added.) Observing that the federal UPPRA (which mandated our Basic Property Insurance Law) was intended "to require the availability of only such insurance as would facilitate financing of construction and rebuilding programs and private investment in inner city areas," DOI advised the Legislature that the criticisms of CFPA were unfounded because the "required coverage of lending institutions financing real or personal property investment in inner city areas [was being] satisfied by the coverages offered by the California FAIR Plan Association." Thus, DOI concluded, "the California FAIR Plan Association

29

is discharging its legislative mandate by affording adequate coverage of basic property insurance."

In 1994 (more than a quarter century after enactment of the Basic Property Insurance Law), DOI adopted a different interpretation of the legislative mandate undergirding the statutory definition of "basic property insurance." Minutes of a CFPA committee meeting, dated May 20, 1992, reflect that, following recent riots in Los Angeles, concerns had begun to take shape over the availability of suitable business insurance in affected inner-city areas. CFPA learned that DOI was in discussions with the Legislature "to extend" the basic property insurance coverages the association offered, and suggested that a "better way to handle" the matter would be for the parties "to solve [the] perceived problems" among themselves, "rather than deal through the legislature." DOI agreed to the proposal, and the parties held a meeting where they discussed the department's desire to have CFPA offer "business interruption" and "general liability" insurance to affected inner-city businesses. CFPA's then-General Manager "informed the Governing Committee that the section relative to the FAIR Plan in the Insurance Code appeared to be broad as far as the powers of [the Commissioner] were concerned," and requested that CFPA's counsel "give his opinion as to what power the Commissioner held."

In March 1993, CFPA's counsel provided a letter that was forwarded to DOI, expressing his opinion that, "without any new legislation, the FAIR Plan may, with the Commissioner's approval, add the business owners package policy to the coverages it offers, so long as the FAIR Plan does not offer any insurance on automobile or farm risks." As primary justifications for his interpretation, counsel reasoned: (a) "Congress left it

30

up to each state to add coverages to the mandatory, minimum insurance" required under the federal UPPRA that led to CFPA's creation; (b) "it is consistent with the Legislature's statements of the purposes of establishing the FAIR Plan that the phrase 'and such other insurance coverages as may be added with respect to such property' be construed to permit" the proposed business liability coverage; (c) "[t]o construe the phrase more narrowly, or limiting it to pure first party property coverage, would . . . thwart the reasons for establishing the FAIR Plan"; and (d) "the Legislature appears to have recognized that 'basic property insurance' could be expanded to include liability insurance . . . by finding it necessary to exclude from that definition insurance on automobile risks, almost all of which constitutes liability insurance."

After further deliberation, CFPA crafted a BOP with an endorsement limiting liability coverages to premises, operations, and projects specifically designated by the insured. According to committee minutes from May 1993, DOI's liaison with CFPA "requested a review of the liability coverages to ensure that the coverage given [would be] narrowed to premises related coverage," as the department had apparently concluded this "would ensure that the liability coverage would comply to that permitted to the current FAIR Plan legislation."

In July 1993, CFPA approved a plan to expand coverage to offer the BOP. In March 1994, the Commissioner approved the BOP, specifically quoting section 10091's "other insurance coverages" language. CFPA has continuously offered the policy since then.

The trial court concluded the "administrative history relating to the BOP supports giving deference to the

31

Commissioner in his current interpretation" of the Basic Property Insurance Law. While the court acknowledged DOI's 1972 report showed the department "has not had a consistent interpretation of the [law] since its original adoption," the court reasoned that, in view of "the development of [DOI's] position over time," it was appropriate to "afford[ ] less weight to [DOI's] views in [the] 1972 report than to the Commissioner's current interpretation" of the law. Because "the Commissioner's current interpretation is generally consistent with [DOI's] prior approval of liability coverage in the BOP," the court concluded the department's proffered construction was "entitled to substantial deference."

The trial court's reasoning has the prescribed analysis backwards. *Yamaha* teaches that deference to a long-standing agency interpretation may be warranted when the "interpretation was *contemporaneous* with legislative enactment of the statute being interpreted" and the agency " 'has *consistently* maintained the interpretation in question.' " (*Yamaha, supra,* 19 Cal.4th at p. 13, italics added.) Neither is true of the new interpretation that DOI adopted to approve the BOP in 1994. Because our fundamental task in construing a statute is to ascertain the Legislature's intent *when it enacted the law*, it is the "*contemporaneous construction of a new enactment* by the administrative agency charged with its enforcement" that commands respect—not an interpretation formulated a quarter of a century later. (*Dyna-Med, supra,* 43 Cal.3d at pp. 1388–1389, italics added [rejecting agency interpretation offered "more than 20 years after the Act's enactment"]; see also Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies* (1995) 42 UCLA L.Rev. 1157, 1197 (hereafter Asimow) [deference may be afforded

to a "contemporaneous" interpretation on the theory that "agency personnel were probably instrumental in working with legislative committees responsible for passing the statute and so were familiar with legislative intent and the compromises embodied in the law"].)

The reasons to require consistency are equally well grounded. The second category of *Yamaha* factors seeks to assess the likelihood that the agency's interpretation is correct. When an agency has changed its position over time—particularly in apparent response to a new phenomenon that could not have influenced the statute's original enactment—there is good reason to doubt that the new interpretation is sound. (See *Yamaha, supra,* 19 Cal.4th at p. 13 [" '[a] vacillating position . . . is entitled to no deference' "].) "Of course, an agency can abandon an old interpretation and substitute a new one, *provided that the agency explains and rationally justifies the change*. However, the new interpretation would lack the deference called for by a consistently maintained interpretation." (Asimow, *supra,* 42 UCLA L.Rev. at pp. 1197–1198, italics added.)

DOI's apparent justifications for abandoning the 1972 interpretation raise their own doubts under the second category of *Yamaha* factors. The record confirms the department's 1994 interpretation was not the product of any formal rulemaking, adjudication, or published guidance. Rather, it relied upon an internal letter drafted by counsel for CFPA—not the department itself—that was apparently solicited to avoid legislative action contemplated in response to the 1992 Los Angeles riots. The letter does not reflect meaningful deliberation by DOI, nor does it purport to interpret the statute on behalf of the department in any official capacity. It thus lacks the indicia of reliability

and institutional authority that might warrant judicial deference under *Yamaha*. (See *Yamaha, supra,* 19 Cal.4th at p. 13 ["If an agency has adopted an interpretive rule in accordance with Administrative Procedure Act provisions—which include procedures (e.g., notice to the public of the proposed rule and opportunity for public comment) that enhance the accuracy and reliability of the resulting administrative 'product'— that circumstance weighs in favor of judicial deference."].)

Moreover, the letter's reasoning is not altogether convincing. While the letter asserts that construing section 10091 to exclude liability coverage would "thwart the reasons for establishing the FAIR Plan," it provides no analysis of the law's statutory purposes to support the claim. This contrasts with DOI's 1972 report, where the department gave a near contemporaneous account of the events that led to the Basic Property Insurance Law's enactment and related the "narrow scope of legislative intent at the time the FAIR Plan was created" to the stated purposes of the law set forth in section 10090. (See, e.g., fn. 9, *ante*.) As discussed, those purposes—stabilizing the property insurance market, encouraging use of the normal market, and equitably distributing the burden among property insurers—are all tied to first-party property risks. It is not at all clear from counsel's letter how he determined these statutory objectives would be served by offering liability coverage. He simply gave no explanation for this conclusion. (See *Rodgers, supra,* 36 Cal.3d at p. 341 [rejecting proffered statutory construction that "simply assumes its conclusion"].)

The letter's reliance on the exclusion of "automobile risks" in section 10091 is similarly flawed. The entire provision excludes "automobile risks, commercial agricultural commodities

34

or livestock, or equipment used to cultivate or transport agricultural commodities or livestock" (§ 10091, subd. (c)(1)) —all of which are categories of *personal property*. While "automobile risks" can refer to liability claims, we ordinarily construe lists of statutory terms to have a similar scope on the assumption that they each were intended to operate in the same manner. (See *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 960 [under the "canon of statutory construction, known as *noscitur a sociis*, . . . 'the meaning of a word may be ascertained by reference to the meaning of other terms which the Legislature has associated with it in the statute, and . . . its scope may be enlarged or restricted to accord with those terms' "].) Thus, contrary to the letter's assumption, the term "automobile risks" must be understood in light of its statutory neighbors, all of which plainly refer to risks associated with damage to personal property stored or maintained at a fixed location—not liability risks. (See *Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 40 [a court should " ' "adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make . . . the item markedly dissimilar to the other items in the list" ' "].)

In sum, DOI's 1994 interpretation of section 10091 is neither contemporaneous with the Basic Property Insurance Law's enactment nor the product of formal agency deliberation. It contradicts the department's earlier statements to the Legislature and rests on reasoning that fails to engage with the law's text, structure, or purposes. Under the framework prescribed in *Yamaha*, the trial court should not have deferred to DOI's proffered interpretation under these circumstances. Indeed, even when the circumstances weigh in favor of judicial deference, final responsibility for construing a statute " ' "rests

with the courts." ' " (*Yamaha, supra,* 19 Cal.4th at p. 13; accord *Dyna-Med, supra,* 43 Cal.3d at p. 1389.)  Here, as we have discussed, the historical context of the Basic Property Insurance Law's enactment, its stated purposes, and the overall statutory scheme, all favor a construction of section 10091, subdivision (c) that confines the statutory definition of "basic property insurance" to first-party coverages against direct loss or damage to property.  The trial court erred when it construed the statute to authorize the Commissioner to add liability coverages.

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court with directions to vacate its order denying the petition for writ of mandate and to enter a new order granting the writ. The California FAIR Plan Association is entitled to its costs.


**CERTIFIED FOR PUBLICATION**



EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.

36